The opinion of the court was delivered by
Monroe, J.
This is a petitory action, brought by the heirs of Joseph Bilgery, fon the recovery of twelve lots of ground in New Orleans, with the buildings thereon, known as the Second Street Market, together with certain rents and revenues. The defendants were the City of New Orleans, and its lessee, the New Orleans Contracting Company, Limited, but the contractor, having disclosed its lefesor, was dismissed from the case, and the only defendant now before the court is the City of New Orleans, who pleads the prescription of one, two, three, five and ten years, and alleges that Joseph Bilgery acquired the rights and assumed the obligations of Joseph Raymond! under ordinance No. 2041, A. S., and by that title operated the market in question for twenty years, and thereafter, to-wit, upon March 18, 1894, in accordance with the terms of the said ordinance and with the obligations of said Raymond, turned the same over to respondent, and that plaintiffs are, therefore, estopped to make the claim here set up, and should be condemned to make a clear title of said property to respondent, and she prays judgment accordingly.
The facts, as disclosed in the record, are as follows:
Upon March 18, 1873, the Council of New Orleans passed an ordinance, No. 2041, A. S., granting to Joseph Raymond permission to erect, at his own expense, a market-house, on the lots in question, and there conduct a market under municipal supervision, subject to the conditions ; that, at the end of ten years, the city should assume the administration of said market, and should, for a period of ten years, retain all revenues in excess of $500.00 per month (or $6,000.00 per year); and that, at the end of twenty years, the property should revert to the city. It was further provided that the city should impose no taxes on said property, and that Raymond should not alienate, divert, or incumber it, to the prejudice of the city’s rights; and the provisions of this ordinance were embodied in a contract, entered into between Raymond and the city, April 10, 1873, and duly registered in the conveyance office on 'the 17th of the same month.
*1552 It appears, however, that the lots upon which the market-house was to be erected had been purchased by Raymond from the Union National Bank, on February 27, 1873, for something over $14,000.00, of which a comparatively small part was paid in cash, and for the balance, of over $11,000.00, Raymond gave notes, secured by mortgage and vendor’s privilege, which were outstanding and unpaid when the contract with the city was entered into. It further appears that, in April, 1876, some of the notes mentioned being past due, the bank caused executory process to issue thereon, under which the property was seized, and, upon March 3, 1877, adjudicated to Joseph Bilgery, as the subrogee of the seizing creditor, holding the ranking mortgage and privilege. Bilgery having gone into possession of the property, died in September, 1877, leaving a widow, and four children, viz: a son by a previous marriage, and three daughters by the wife who survived him. In 1878, the widow acquired the interest of the son, Joseph M. Bilgery, and, thereafter, in 1879, she, also, died, and her three daughters, issue of the marriage with Joseph Bilgery, became owners of the entire property, and were put in possession, and so remained until March 30th, 1894, when the City of New Orleans, acting through the Commissioner of Police and Public Buildings, took possession; the circumstances connected therewith being thus stated, in a letter from the Commissioner to the Mayor, of date April 2, 1894, to-wit:
“Dear Sir — Acknowledging receipt of-yours of the 29th ult. enclosing “ copy of letter from City Attorney O’Sullivan, of same date, relative “ to the expiration of the lease of tho Second Street Market, wherein he “advises that I notify Joseph Raymond, or his agent to immediately “ turn over the market to the City of New Orleans, I beg to report as “ follows: On the morning of the 30th ult., I sent my chief clerk, Mr. “Joseph E. Manning, to take charge, and collect the revenues, of the “ Second Street Market. lie immediately proceeded to notify the “ several people occupying stalls therein that he was acting as the rep- “ resentative of the city, and that the city would collect the revenues “from that date, the 30th of March, 1894. While Mr. Manning was “ in the act of notifying the different persons occupying stalls therein, “ the party who has been collecting the revenues (presumably one of the “ Bilgerys) ordered the occupants of the stalls to pay no one for the “ present, but as Mr. Manning was about completing his list of people “ occupying stalls in the market he called out to Mr. Manning that he *1553 “ had been mistaken, and that everything was all right now, and that “ he (Hanning-) could collect, as he bad informed the people occupying “ stalls to pay him. Mr. Manning, thereupon, collected said revenues for “that day (March 30, 1894,) reported the amount to my office, and I “ had the same deposited with the City Treasurer. * * * There was “ no opposition made by any one to the collection of revenues on the “ 31st ult. Commencing the 1st day of April, 1894, I ordered Mr. John “ T. Carlin, commissary of the Magazine Market, to collect the rev- “ enues of the Second Street Market, and report the same to this office, “ when I will deposit the amount daily with the Treasurer,” etc.
There is, also, in the record a communication, produced by, and offered in evidence on behalf of, the plaintiffs, which reads as follows, to-wit:
“New Orleans, March 30, 1894.

“Messrs Raymond & Bilgery, City.

“Gentlemen. — This is to notify you, that the lease, under the “contract, of the Second Street Market, has expired, and that, repre- “ senting the City of New Orleans, I have this day taken possession of “ the same, and in the presence, and with the assistance, of the party “ who has been collecting- the revenues of said market, I have collected “ the revenues of this day, for the benefit of the city of New Orleans, “ reserving-, of course, to the City of New Orleans, the right to sue for “ the balance due her, by you, under the terms of the contract.
“Yours respectfully,
“(Signed) O. Taylor Gauche,

“Gomr. Police and Pub. Bldgs.

“J. E. M.”
And from that date, the city remained in undisturbed possession, and heard nothing, so far as this record discloses, of the Bilgea-ys, until the institution of this suit, in October, 1897. The property has been, in the meanwhile, operated as a public market, and it is admitted that the city and her lessees have collected from the occupants, during the period from April 1, 1894, to March 28, 1899, a total of $17,430.10, for which amount, with interest, the plaintiffs have obtained judgment.
Opinion.
It is plain that Raymond could have made no contract affecting the property in question to the prejudice of the rights of his vendor, the *1554 Union National Bank, and lienee that the-adjudicatee, who purchased the property at the sale made for the enforcement of those rights, acquired it free of any incumbrance resulting- from Raymond’s contract with the city. It was so held in N. O. National Bank vs. Raymond, 29 Ann., 355. It is true that, the city consenting, the adjudicatee might have taken Raymond’s xilace, and, accepting the consideration, have become bound for all the obligations of his contract. On the other hand, he was at liberty to ignore Raymond’s contract and make a totally different one for his own account, or make such use of the property as he thought advisable. The evidence fails to show that any agreement, whatever, was entered into with the city, and makes it reasonably certain that there was none. It also makes it probable, however, that Bilgery and his widow and heirs have used the xn’operty, since the former acquired possession of it, for the same purposes that Raymond was to have used it, under his contract, and that they have enjoyed the Xirivileges and immunities conteinqolated by that contract, that is to say; that they have enjoyed the franchise of operating a public market, upon proxierty which has been exempt from taxation, and with the advantages resulting from municipal ordinances and regulations imposing restrictions upon the keeping of xn-ivate markets. But this probability is an insufficient basis for a judgment, and if that which is thus made x>rob-able were established as a fact it would still fall short of making out a case which would justify this court in holding that the title to the real estate in question, legally vested in Bilgery and his heirs, had been divested and transferred to the city.
If it is true that the Bilgerys have exercised a public franchise in the use which they have made of the said property, and have enjoyed exemption from taxation, upon the assumption that they would transfer the property to the city at the expiration of Raymond’s contract, they should be held to account for the advantages which they have received, but such an assumption does not authorize a judgment in favor of the city for the property.
Upon the other hand, the acquiescence of the plaintiffs in the demand made by the city for possession and in the possession thus yielded, from May 30, 1894, until the filing of this suit, October 23, 1897, acqui, the city of having been a possessor in bad faith during- that period. “The “ possessor in bad faith is he who possesses as master, but who assumes “ the quality, when he well knows that he has no title to the thing or *1555 “ that his title is vicious or defective.” O. O. 3452. Raymond’s contract provided that, at the expiration of the term fixed, the city should be put in possession of the property as owner, the language reading as follows, to-wit: “At the expiration of which time, the market-house “ and grounds on which it is built and so much of the surrounding' “ ground as has been left open for the passage around the market, shall “ be turned over to the City of New Orleans, and said city shall be put “ in full possession of ownership of said market.” The city, assuming that the contract was still controlled by Raymond, or that the Bilgerys had elected to stand in Raymond’s shoes, made its demand for possession, agreeably to this stipulation, and, the possession being yielded without objection, was justified in the belief that it h«.d acquired, and thereafter held, lawfully, so that it can not be said that it assumed the quality of master knowing that it had no title. The judgment appealed from is, therefore, erroneous in condemning the city for rents and revenues from May 30, 1894, to October 23, 1897. It is also erroneous in taking as a basis for the amount allowed from and after the latter date the revenues of the property resulting- from its use as a public market, since the plaintiffs are entitled to recover no more than they could have derived from the property itself, apart from the enjoyment of the market franchise.
It is therefore ordered, adjudged and decreed, that, in so far as the judgment appealed from condemns the defendant for rents and revenues of the property in question, the same be annulled, avoided and reversed, and that, as to such rents and revenues for the period between May 30, 1894, and October 23, 1897, the demand of the plaintiffs be rejected, and that as to such revenues, since October 23, 1897, said demand be rejected as in case of non-suit. It is further ordered and adjudged that, in so far as said judgment decrees the plaintiffs to be the lawful owners of the property herein claimed, and entitled to possession thereof, the same is hereby affirmed. It is further ordered, adjudged and decreed that all legal rights of the city with respect to taxes upon the said property since May 18, 1873, and with respect to any claim which it may have arising out of the use made of said property, and of any franchise or privilege in connection therewith, be reserved. It is further ordered that the defendant pay the costs of the lower court and that the plaintiffs pay the costs of the appeal.